## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JACOB LANCE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 18-4933** |
| | : | |
| **MIDLAND CREDIT MANAGEMENT** | : | |
| **INC.,** *et al.* | : | |

## **MEMORANDUM**

**KEARNEY, J.**                                                                                         **May 16, 2019**

In exchange for a credit card, a debtor admittedly agreed to arbitrate disputes with the bank issuing the credit card, waive class action rights, and to allow the bank to sell all of its right under either his credit card agreement or his account to a debt collector. After the account went into default, the credit card company sold the account to a debt collector who sent a letter seeking to collect the defaulted debt. The credit card holder then sued the debt collector for violating the Fair Debt Collection Practices Act. The debt collector moved to compel arbitration after purchasing the account. Two months ago, we denied the debt collector's motion to compel arbitration because it failed to show it purchased either the agreement with the arbitration mandate or the rights under the "account" it purchased.

We allowed the debt collector to take discovery and renew a motion to compel arbitration should it adduce evidence of buying the arbitration right after discovery. Five weeks later, the debt collector presented its purchase agreement evidencing its purchase of all right to the account, including the right to arbitration and class action waiver, from the bank. As the bank's right to arbitrate is within "all" of its right sold to the debt collector, the debt collector may compel individual arbitration of this dispute within the scope of the arbitration clause.

## I.    Undisputed facts.

Jacob Lance opened a CareCredit Card account with Synchrony Bank on December 12, 2016[1] by signing a CareCredit Card Account Agreement ("Credit Card Agreement).[2] Mr. Lance used the account for purchases but did not make payments.[3] The Credit Card Agreement contains three provisions material to the motion to compel arbitration: (1) an assignment clause; (2) an arbitration clause; and (3) a class action waiver.[4]

### *The assignment clause.*

The assignment clause provides "We may sell, assign or transfer any or all of our rights or duties under this Agreement *or* your account, including our rights to payments. We do not have to give you prior notice of such action. You may not sell, assign or transfer any of your rights or duties under this Agreement or your account."[5]

### *The arbitration clause.*

The arbitration clause provides, in bolded, capitalized letters "Please read this section carefully. If you do not reject it, *this section will apply to your account*, and most disputes between you and us will be subject to individual arbitration. This means that: (1) neither a court nor a jury will resolve any such dispute; (2) you will not be able to participate in a class action or similar proceeding; (3) less information will be available; and (4) appeal rights will be limited."[6]

The arbitration clause described the type of claims subject to arbitration including, *inter alia*: "If either you or we make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user *of your account*, and us, our affiliates, agents and/or providers that accept the card or program sponsors it if relates to *your account*, except as noted below" and "Notwithstanding any other language in this section, only a court, not an arbitrator, will decide disputes about the validity, enforceability, coverage or scope of this section or any part thereof

2

(including, without limitation, the next paragraph of this section and/or sentence). However, any dispute or argument that concerns the validity or enforceability of the Agreement as a whole is for the arbitrator, not a court, to decide."[7]

## *Class action waiver.*

In bolded, capitalized letters, the Credit Card Agreement provides "No Class Actions" stating "You agree not to participate in a class, representative or private attorney general action against us in court or arbitration. Also, you may not bring claims against us on behalf of any accountholder who is not a [sic] accountholder on your account, and you agree that only accountholders on your account may be joined in a single arbitration with any claim you have."[8]

The Credit Card Agreement additionally provides the "Arbitration section" is governed by the Federal Arbitration Act and Utah law applies "to the extent state law is relevant under the FAA."[9] The Agreement further provides "[t]he arbitrator's decision will be final and binding, except for any appeal rights under the FAA. Any court with jurisdiction may enter judgment upon the arbitrator's award."[10]

## *Synchrony Bank and Midland Funding enter into a Forward Flow Accounts Purchase Agreement.*

On August 4, 2017, Synchrony Bank and Midland Funding LLC signed a Forward Flow Accounts Purchase Agreement ("Purchase Agreement").[11] The parties represented Synchrony Bank "desires to sell to [Midland Funding], during the Transfer period, delinquent charged-off credit card Accounts, on the terms and conditions herein set forth, as such Accounts exist as of the applicable Cut-Off Date; ..."[12]

The Purchase Agreement defines "Account" as "any charged-off credit card account owned by [Synchrony Bank] that is being sold to [Midland Funding] pursuant to the terms of this

3

Agreement with respect to which there is an Account Balance."[13] The Purchase Agreement defines "Account Balance" as "any credit account that is being sold to [Midland Funding] pursuant to the terms of this Agreement, as such balance exists as of the Cut-Off Date, to the extent such balance is set forth on the applicable Notification File."[14]

Article II of the Purchase Agreement—"Purchase and Sale of Accounts—provides "Purchase and Sale. On each Transfer Date, [Synchrony Bank] shall sell and [Midland Funding] *shall buy all right (including the right to legally enforce, file suit, collect, settle or take any similar action with respect to such Account*), title and interest in and to the Accounts identified in a Notification File, with recourse and warranty limited to that specifically set forth in this Agreement ...."[15]

In Article IV of the Purchase Agreement—"Representations and Warranties"— Synchrony Bank represented and warranted the "[Synchrony Bank's] survey and specifications document provided by [Synchrony Bank] and attached hereto as Exhibit G is materially accurate."[16] Synchrony Bank's "Credit Card/General Seller Survey," attached to the Purchase Agreement at Exhibit G, shows "[a]rbitration can be invoked" on the "the cardholder agreement applicable to this portfolio ...."[17]

### *Synchrony Bank defaults Mr. Lance's account and then sells its "Accounts" to Midland under a Bill of Sale.*

On September 20, 2017, Synchrony Bank charged off Mr. Lance's account with a balance of $1,065.78.[18] One month later, in October 2017, Synchrony Bank sold several accounts, including Mr. Lance's account, to Midland Funding.[19] Midland Credit Management, Inc. ("Midland Credit") services the account for Midland Funding.[20]

4

The Bill of Sale provides "[f]or value received and in further consideration of the mutual covenants and conditions set forth in the Forward Flow Accounts Purchase Agreement (the "Agreement"), dated as of the 4th day of August, 2017 by and between Synchrony Bank ... and Midland Funding..., [Synchrony Bank] hereby transfers, sells, conveys, grants, and delivers to [Midland Funding], its successors and assigns, without recourse except as set forth in the Agreement, the Accounts as set forth in the Notification Files, delivered by [Synchrony Bank] to [Midland Funding] on October 22, 2017, and as further described in the Agreement. Capitalized terms not defined herein shall have the definition ascribed in the Agreement."[21] We did not know when we issued our earlier Order denying the motion to compel, but we know now, the definition of "Account" from the Purchase Agreement and exactly what Midland bought from Synchrony Bank.

## *After acquiring Mr. Lance's account, Midland Credit sends an allegedly deceptive and misleading letter.*

On April 25, 2018, Midland Credit sent Mr. Lance a "collection letter" for the balance on his account.[22] Mr. Lance alleges the letter is false, deceptive, and misleading under the Fair Debt Collection Practices Act.[23] Mr. Lance seeks to certify a class of all Pennsylvania consumers who received the same letter from Midland Credit "concerning debts for Synchrony Bank/Care Credit used primarily for personal, household, or family purposes within one year prior to the filing" of the complaint for violations of the Fair Debt Collection Practices Act.

## *We denied Midland's earlier motion to compel arbitration.*

On February 11, 2019, Midland moved to compel individual arbitration.[24] Mr. Lance requested a two week extension to respond to the motion to compel arbitration citing a "heavy

motion calendar and several previously scheduled depositions."[25] We granted the extension in part, allowing Mr. Lance to respond to the motion to compel arbitration no later than March 8.[26]

In its motion to compel arbitration, Midland argued the arbitration clause in Mr. Lance's Credit Card Agreement with Synchrony Bank required arbitration and the class action waiver precluded Mr. Lance's class claims. Midland argued it is the assignee of Synchrony Bank's Credit Card Agreement with Mr. Lance.

In response, Mr. Lance argued he did not agree to arbitrate with Midland.[27] He argued Synchrony Bank only sold his "account and right to collect on the account" but did not assign all of its rights including the right to arbitration. Mr. Lance did not contest Synchrony Bank's right to arbitration; only whether it assigned its right to arbitration to Midland. Our inquiry did not focus on whether Mr. Lance agreed to arbitration with Synchrony Bank. Instead, we questioned whether Synchrony Bank's assignment, through a Bill of Sale, of its "Accounts" included the separate right to arbitrate.

In its reply brief, Midland asked for discovery "to the extent [we] conclude [Mr. Lance's] argument raises sufficient doubt as to the arbitrability of this case."[28] On March 22, 2019, we concluded, on the record then before us, we could not find the word "Account" on the Bill of Sale between Synchrony Bank and Midland Funding "automatically includes all 'rights and duties' under the Agreement with Mr. Lance," including Synchrony Bank's right to arbitration.[29] We denied Midland's motion and extended filing deadlines for motions for summary judgment or class certification to allow, among other things, the parties' further inquiry into whether Synchrony Bank sold its right to arbitrate to Midland.[30]

6

### *The parties' motion practice after our March 22, 2019 Order denying Midland's Motion to compel arbitration.*

Our March 22, 2019 Order denying Midland's motion to compel extended the deadlines in our January 23, 2019 Scheduling Order to allow Phase I motions for summary judgment on Mr. Lance's claims or for class certification to be filed no later than May 3, 2019 with responses due no later than May 20, 2019.[31] Mr. Lance inexplicably moved for class certification on April 15, 2019 several weeks earlier than required.[32] Midland's response (now mooted) would have been due May 20, 2019.

On April 25, 2019, anticipating filing a renewed motion to compel arbitration, Midland moved to file portions of its Purchase Agreement under seal in support of its renewed motion.[33] We granted Midland's motion to seal in part,[34] and Midland filed its renewed motion to compel arbitration on April 29, 2019.[35]

On May 3, 2019, Mr. Lance moved for summary judgment consistent with our scheduling Order.[36] Midland's response (now moot) would be due May 20, 2019. A review of the appendix supporting Mr. Lance's motion for summary judgment shows the parties engaged in written discovery and document production; Midland responded to Mr. Lance's Requests for Admission on February 21, 2019 and it appears Midland produced documents to Mr. Lance.[37] Although undated, it also appears Midland responded to Mr. Lance's First Set of Interrogatories.[38]

### II.    Analysis

On April 30, 2019, Midland renewed its motion to compel individual arbitration and stay our further progress.[39] When we last addressed the issue, Midland had not shown what it bought. It now adduced evidence based on the Purchase Agreement which we did not have earlier:

7

- An "Account" means any charged-off credit card account owned by Synchrony Bank "that is being sold to" Midland under the terms of the Purchase Agreement "with respect to which there is an Account Balance."[40]

- Synchrony Bank sold and Midland bought "*all right* (*including the right to legally enforce, file suit, collect, settle or take any similar action with respect to such Account*), title and interest in and to the Accounts identified in a Notification File, with recourse and warranty limited to that specifically set forth in this Agreement ...[41]

Midland argues Section 2.1 of the Purchase Agreement shows it bought "all right" to Mr. Lance's "Account"—which we know is a charged-off credit card account owned by Synchrony Bank and sold to Midland under the terms of the Purchase Agreement. Midland argues "all means all" and when Synchrony Bank sold Mr. Lance's Account to Midland, it sold *all* rights, including the right to arbitration in the Credit Card Agreement.[42]

In response, Mr. Lance argues Midland fails to show it acquired the right to arbitrate. He contends Section 2.1 of the Purchase Agreement—particularly the language Midland "shall buy all right (including the right to legally enforce, file suit, collect, settle or take any similar action with respect to such account), title and interest in and to the Accounts identified in a Notification File"—shows only Midland bought the "Account" not the rights under the Credit Card Agreement including the arbitration clause. Mr. Lance additionally argues his Fair Debt Collection Practices Act claims are not within the scope of the arbitration agreement and Midland waived its right to arbitrate.

We conclude under the plain language of the Purchase Agreement Midland bought all rights to Mr. Lance's Account which includes the right to arbitration, Mr. Lance's Fair Debt Collection Practices Act claim is within the scope of the arbitration clause, and Midland did not waive its right to compel arbitration as it purchased.

8

## A. We apply a Rule 56 standard.

In the current motion to compel arbitration, neither Midland nor Mr. Lance offers the standard of review we should apply under *Guidotti v. Legal Helpers Debt Resolution, LLC*.[43]  In its first motion to compel, Midland did not advocate for a standard, but in its reply brief asked for discovery "to the extent [we] conclude [Mr. Lance's] argument raises sufficient doubt as to the arbitrability of this case." Mr. Lance contended motions to compel arbitration are reviewed under the summary judgment standard of Rule 56.

Under *Guidotti*, we review a motion to compel arbitration under the motion to dismiss standard of Rule 12(b)(6) or the motion for summary judgment standard under Rule 56. We apply the Rule 12(b)(6) standard "when it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause.'"[44] We apply a Rule 56 standard "if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then 'the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question.'"[45]

We applied a Rule 12(b)(6) standard to Midland's first motion to compel arbitration. We denied the motion and, anticipating Midland may renew its efforts to compel arbitration and the parties' possible need to explore the terms of the assignment between Synchrony Bank and Midland, we extended filing deadlines on Phase I motions for summary judgment on Mr. Lance's claims or for class certification.[46]

At this juncture, we apply a summary judgment standard to Midland's renewed motion to compel individual arbitration and for stay. Under this familiar standard, we "shall grant summary

9

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[47] "The party asserting that there is a genuine dispute of material fact must support that assertion by 'citing to particular parts of ... the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials.'"[48] "In evaluating the motion, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'"[49]

## B. Midland purchased Synchrony Bank's right to arbitrate and Mr. Lance's claims are within the scope of the arbitration clause.

Before compelling an unwilling party to arbitrate, we must determine whether "(1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement."[50] When making this determination, "there is a presumption in favor of arbitrability" and we "look to ordinary state law principles of contract formation."[51]

### 1. There is no genuine issue of fact regarding Midland's purchase of Synchrony Bank's right to arbitration.

The Credit Card Agreement between Mr. Lance and Synchrony Bank contained an assignment clause and an arbitration clause. Under the assignment clause, Synchrony Bank "may sell, assign or transfer any or all of our rights or duties under this Agreement *or* your account, including our rights to payments."[52] The arbitration clause requires arbitration, providing *inter alia*, if Mr. Lance "[did] not reject it, *this section will apply to your account*, and most disputes between you and us will be subject to individual arbitration. ..."[53]

In opposition to Midland's first motion to compel arbitration, Mr. Lance argued he did not agree to arbitrate with Midland and Synchrony Bank did not assign its right to arbitration to Midland. He argued there is no evidence Midland assumed *all rights* under the Credit Card

10

Agreement, including the right to arbitration. We now have the Purchase Agreement between Synchrony Bank and Midland and we know what Midland bought: it bought "all right (including the right to legally enforce, file suit, collect, settle or take any similar action with respect to such Account), title and interest in and to the Accounts ..."[54] And the Purchase Agreement defines "Account"—as used in the Bill of Sale between Synchrony Bank and Midland Funding—as "any charged-off credit card account owned by [Synchrony Bank] that is being sold to [Midland Funding] pursuant to the terms of this Agreement with respect to which there is an Account Balance."[55] Mr. Lance does not dispute his account with Synchrony Bank falls within the definition of "Account" in the Purchase Agreement or the Bill of Sale.

Midland argues the plain language of the Purchase Agreement shows by buying "all right ... title and interest in and to the Accounts," including Mr. Lance's Account, it acquired *all rights*, including the right to arbitration, held by Synchrony Bank. It focuses on "all right," arguing we must give effect to this clear and unambiguous language. Midland points out there is no exclusion or words of limitation creating any ambiguity as to what it bought from Synchrony Bank; it bought "all right" in Mr. Lance's Account, not just the receivables or the right to collect receivables. Midland argues this makes its case distinguishable from *Garcia v. Midland Funding, LLC*, a recent case from the United States District Court for the District of New Jersey, cited by Mr. Lance in opposing Midland's first motion to compel.[56]

In our earlier decision, we analyzed *Garcia* and analogizing to it, found we could not, absent a definition of "Account" determine whether "rights" and "account" describes two different assets.[57] In *Garcia*, the court found the purchase agreement between Synchrony Bank and Midland "did not clearly convey the right to demand individual arbitration from [Synchrony Bank] to [Midland]."[58] The court focused on the language of the agreement providing separate definitions

11

for "Account" and "Receivable" to find while the agreement passed the "'Receivables' and associated rights" it did not transfer "*all* of the rights associated with Plaintiff's account to [Midland]."[59] Here, the Purchase Agreement between Synchrony Bank and Midland Funding does not have separate definitions for "Account" and "Receivable," making it distinguishable from *Garcia* and eliminating our concern regarding "rights" and "account." Mr. Lance does not argue *Garcia* in his latest opposition to the motion to compel.

Mr. Lance now argues Midland demonstrates it bought only "the account" but not the Credit Card Agreement "and all the rights associated with it." He points the distinction between the "account" and the "rights associated" with his Credit Card Agreement with Synchrony Bank is found in the Agreement itself. He argues the assignment clause provision "we may sell, assign or transfer any or all of our rights or duties under this Agreement or your account" shows Synchrony Bank "separated the rights under the [Credit Card] Agreement (including arbitration) from the rights to the account" and there is no language in the Purchase Agreement "transferring any rights created by the [Credit Card] Agreement, only the rights associated with the collection Account."[60]

We disagree. Section 2.1 of Purchase Agreement sells "all right ... with respect to such Account ..." and plainly conveys all rights, including the right to arbitration, to Midland. In this context and distinct from *Garcia*, we agree "all means all." The right to arbitrate under the Credit Card Agreement is a right held by Synchrony Bank. The Purchase Agreement defines Midland paying for "all" right with respect to Mr. Lance's account. We recognize the assignment clause agreed to by Mr. Lance allows Synchrony Bank to sell its rights under either the Credit Card Agreement or the Account. We still find Midland has not adduced evidence of purchasing rights

12

under the Credit Card Agreement specifically. But the assignment clause reads in the alternative "all of our rights or duties under this Agreement or your account."[61]

We conclude there is no genuine issue of fact Midland bought Synchrony Bank's right to arbitration and will grant Midland's motion to compel individual arbitration and stay the matter pending arbitration. Section 3 of the Federal Arbitration Act provides for a stay of proceedings where the action is referable to arbitration: "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."[62] We will stay the action on Midland's application for stay.

Mr. Lance does not address the class action waiver also contained in the Credit Card Agreement. Mr. Lance agreed "not to participate in a class, representative or private attorney general action against us in court or arbitration" and agreed he "may not bring claims against us on behalf of any accountholder who is not an accountholder on your account ...."[63] There is no genuine issue of fact on the class action waiver and we will compel Mr. Lance to individual arbitration.

### 2. There is no genuine issue of fact Mr. Lance's claims are within the scope of the arbitration clause.

Mr. Lance argues now, as he did when opposing Midland's first motion to compel, his Fair Debt Collection Practices Act claims are not within the scope of the arbitration clause. He cites the language of the arbitration clause identifying the type of claims subject to arbitration: "If either

13

you or we make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user *of your account*, and us, our affiliates, agents and/or providers that accept the card or program sponsors it if relates to *your account*, except as noted below" and "Notwithstanding any other language in this section, only a court, not an arbitrator, will decide disputes about the validity, enforceability, coverage or scope of this section or any part thereof (including, without limitation, the next paragraph of this section and/or sentence). However, any dispute or argument that concerns the validity or enforceability of the Agreement as a whole is for the arbitrator, not a court, to decide."[64]

Mr. Lance concedes while he "would ostensibly have to arbitrate claims against [Midland], *if* the claims related to [his] 'account,'" he is not required to arbitrate his Fair Debt Collection Practices Act claims because they "are not claims related to [his] account."[65] He relies on three cases to support his argument. All are distinguishable.

In *Pacanowski v. Alltran Financial, LP*, the court found a Fair Debt Collection Practices Act claim did not fall within the scope of an arbitration agreement brought by plaintiff against a non-signatory to the agreement.[66] The court recognized "many Courts have held that [FDCPA] claims are 'not categorically exempt from the [Federal Arbitration Act's] reach," but concluded the claim is not covered by the arbitration clause because the defendant is a non-signatory to the agreement.[67]

Similarly, in *White v. Sunoco, Inc.*, our Court of Appeals upheld the denial of a motion to compel arbitration.[68] There, Sunoco, a non-signatory to a credit card agreement between plaintiff and Citibank containing an arbitration clause, moved to compel arbitration of claims alleging fraud and other state law claims against Sunoco relating to a rewards program. The court examined whether Florida and South Dakota law would apply equitable estoppel to prevent plaintiff, a

14

signatory to an arbitration clause, from avoiding arbitration against a non-signatory.[69]  It found under those states' laws, equitable estoppel would apply "if a plaintiff-signatory asserts a claim against a defendant based on an agreement, that plaintiff may be equitably estopped from avoiding arbitration on the basis that the defendant was not a signatory to the same agreement."[70]  The court concluded plaintiff's claims against Sunoco regarding its alleged fraudulent promise to discount fuel at Sunoco locations "do not rely on any terms in the Card Agreement" with Citibank.[71]  But this is not the situation here; unlike Sunoco, we have evidence Midland bought Synchrony's rights, and the claims here arise from Midland's alleged wrongful conduct in attempting to collect debt under the Credit Card Agreement.

Mr. Lance also cites *Bazemore v. Jefferson Capital*, a decision from the United States District Court for the Southern District of Georgia.[72]  There, the plaintiff entered into a credit cardholder agreement containing an arbitration provision.  The creditor "sold all of its rights, title and interest to a pool of accounts" to defendant Jefferson Capital.[73]  Plaintiff brought a Fair Debt Collection Practices Act claim against Jefferson Capital after it filed proofs of claim in plaintiff's bankruptcy.  Jefferson Capital moved to compel arbitration.[74]  The court held plaintiff's Fair Debt Collection Practices Act claim is not within the scope of the arbitration provision, finding "no rational basis to conclude [plaintiff] ceded her federal consumer protection rights to arbitration, especially when her FDCPA claims are focused not upon the payment, calculation, or non-payment of a debt incurred with the bank but upon *the conduct* of a debt collector."[75]  The court held it "cannot conclude that a consumer can sign away her right to seek relief in federal court under consumer protection laws absent a clear and unmistakable intent to do so."[76]

The *Bazemore* case is distinguishable.  First, the court in *Bazemore* noted "questions of payment, calculation, or non-payment on a debt would likely be subject to arbitration" and

15

plaintiff's "case is not about the existence or amount of any debt but grounded in the methods Jefferson Capital sought to employ" and the "violative conduct in this case, i.e. deceptively filing time-barred proofs of claim, arises from or relates to [plaintiff's] account tangentially, at best."[77] Here, Mr. Lance alleges Midland's letter is a collection letter attempting to collect the outstanding balance on his credit card.[78] Second, the *Bazemore* opinion is not binding on this court and we can find no case in this District applying its reasoning and instead find courts in this District hold Fair Debt Collection Practices Act claims subject to arbitration generally.[79] Finally, the language of the arbitration clause here requires "[i]f either you or we make a demand for arbitration, you and we must arbitrate *any dispute or claim* between you ... and us ... *if it relates to your account* ..." with only certain exceptions none of which apply here.[80] The language of the arbitration agreement is broad, including "any dispute or claim ... if it relates to your account" with only certain exceptions which do not exclude Fair Debt Collection Practices Act claims.

Mr. Lance's claims are within the scope of the arbitration agreement.

### C. Midland did not waive its right to arbitration.

Mr. Lance alternatively argues Midland "effectively waived its right to compel arbitration because of the late stage of litigation, in which [Midland] provided the necessary discovery, and the prejudice that would occur."[81] Midland replies it did not waive its right to compel arbitration because Mr. Lance does not show he would be prejudiced if we grant the motion to compel arbitration and he failed to establish the factors to support a waiver.[82]

"Consistent with the strong preference for arbitration in federal courts, waiver is not to be lightly inferred, and waiver will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery."[83] To determine whether a party waived its right to arbitrate, our Court of Appeals applies "a

16

nonexclusive list of factors relevant to the prejudice inquiry" consisting of "[1] the timeliness or lack thereof of a motion to arbitrate ... [; 2] the degree to which the party seeking to compel arbitration has contested the merits of its opponent's claims; [3] whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings; [4] the extent of its non-merits motion practice; [5] its assent to the court's pretrial orders; and [6] the extent to which both parties have engaged in discovery."[84]

Mr. Lance argues while not all of the *Hoxworth* factors are present here, when viewing the case as a whole, he will suffer prejudice if we compel arbitration. He argues applying *Hoxworth* factors shows he will suffer significant prejudice and, if we send the case to arbitration, "the substantial time and expense that [he] spent litigating the case [here] will need to be duplicated in arbitration."[85] He argues Midland "encouraged and invoked the 'litigation machinery' in this case to such an extent that dispositive motions on the main issue have been filed" and any arbitration at this point will result in "duplicative efforts and the loss of substantial effort ... to bring the issue to a decision on the merits."[86]

Applying the first *Hoxworth* factor, Mr. Lance argues Midland failed to timely move for arbitration. He contends Midland failed to act diligently, including its failure to provide an adequate basis to compel arbitration in its first motion to compel and then waiting five weeks from our March 22, 2019 Order to renew its motion with an attached Purchase Agreement five days before the summary judgment deadline.

Applying the third *Hoxworth* factor, Mr. Lance argues Midland "did not even inform [him] that it was going to renew its motion to compel until after the motion for class certification was filed," even though Midland knew he "was diligently conducting discovery and preparing for dispositive motions."[87]

17

Applying the fourth *Hoxworth* factor, Mr. Lance argues Midland's non-merits motion practice pertain to administrative and scheduling matters and should be considered neutral. As to the fifth *Hoxworth* factor, Mr. Lance argues Midland has acquiesced to our orders by participating in a status conference, filing a Rule 26(f) report, established discovery deadlines, requested extensions of time, and engaged in class and individual discovery under our scheduling order. Mr. Lance argues this weighs in favor of waiver.

Applying the sixth *Hoxworth* factor, Mr. Lance argues the parties engaged in discovery which he describes as the lynchpin of prejudice here. Mr. Lance asserts the parties exchanged full written discovery on the merits and he obtained "sufficient discovery" to file both a motion to certify a class and a motion for summary judgment and spent significant time and resources preparing those motions. He contends no further discovery is necessary and we can decide the case on his dispositive motions. Any "removal" of this action to arbitration, Mr. Lance argues, "would be duplicative."

In response, Midland argues there is no prejudice to Mr. Lance. It contends prejudice is "manufactured" pointing out Mr. Lance filed his motion for class certification eighteen days before the deadline and before completing discovery specifically to claim prejudice now.[88] Midland argues Mr. Lance's motion to certify is nearly "identical in all substantive respects" to the motion filed in another case brought by his counsel in *Knight v. Midland Credit Mgmt., Inc.*[89] Midland argues Mr. Lance fails to show how referral to arbitration will result in duplication of efforts, pointing out he fails to offer evidence to show if the matter went to arbitration, discovery would start anew or he would be denied the right to use the discovery taken to date or any other way his efforts would be duplicated.

18

As to the first *Hoxworth* factor, Midland argues its motion is not untimely as it raised arbitration as an affirmative defense, it stated its intention to file a motion to compel in the parties' Rule 26(f) report, and discussed its intention to file a motion to compel during the initial pre-trial conference with the Court. Midland points out its current motion is a renewed motion, filed after its initial motion to compel arbitration on February 11, 2019, and only thirty-eight days after our March 22, 2019 Order. Midland argues these reasons also supports the third *Hoxworth* factor weighing against waiver.

As to the fourth *Hoxworth* factor, Midland argues all of its motion practice to date pertains to its effort to compel arbitration except for one motion requesting a seven day extension to file its first motion to compel. It argues this factor weighs in its favor. Similarly, on the fifth *Hoxworth* factor, Midland argues it raised its intention to compel arbitration from the beginning of this case. It contends the fifth factor pertains to whether a party complied with a court's pretrial orders without raising its intention to arbitrate, making it different from *Gray Holdco, Inc. v. Cassady*, the case cited by Mr. Lance to support his waiver argument.[90]

Finally, as to the sixth factor, Midland contends the parties have taken some discovery but not "*so much discovery*" as to prejudice him.[91] Midland argues it has not taken depositions and filed no motions to compel either discovery responses or testimony. Midland points out it raised the issue of discovery at the parties' initial pretrial conference with us and its concern participating in discovery could be construed as a waiver. Its concern is reflected in our January 25, 2018 Order finding, *inter alia*, "ongoing progress in discovery will not waive the parties' ability to negotiate or oppose arbitration ...."[92]

We are directed by our Court of Appeals to apply the *Hoxworth* factors to determine whether arbitration is waived.[93] We are instructed "[w]hile these factors generally are indicative

19

of whether a party opposing arbitration would suffer prejudice attributable to the other party's delay in seeking arbitration, the answer to the question of whether a party invoking the arbitration clause waived its right to arbitrate is necessarily case specific and thus depends on the circumstances and context of each case."[94] We must weigh the *Hoxworth* factors in "an analysis that goes beyond merely counting the factors for or against finding a waiver."[95]

The first *Hoxworth* factor is timeliness of a motion to compel arbitration. Midland filed its first motion to compel arbitration in a timely manner, albeit with a one-week extension. Mr. Lance responded three and a half weeks later after receiving a requested extension. We see no delay in Midland's initial motion to compel. Mr. Lance complains about the timeliness of Midland's renewed motion to compel arbitration. He argues Midland filed its renewed motion "after the exchange of discovery, after [he] filed for class certification, and merely four days before the deadline to file a motion for summary judgment." While discovery may have been exchanged, the discovery cut-off in this case is not until July 26, 2019.[96] We do not fault Midland for filing its renewed motion, five weeks after we denied its first motion, near the filing deadlines for motions for summary judgment or class certification. We extended the deadlines for filing these motions anticipating Midland's renewed motion to compel arbitration. Midland filed its renewed motion before the May 3, 2019 filing date. Mr. Lance's choice to move for class certification before the deadline does not make Midland's motion untimely. This factor weighs against waiver.

Mr. Lance does not address the second *Hoxworth* factor asking the degree to which the party seeking to compel arbitration—Midland—has contested the merits of its opponent's claims. As Mr. Lance must concede, Midland has yet to respond to the motion for class certification and motion for summary judgment. This factor weighs against waiver.

20

The third *Hoxworth* factor asks whether the party moving to compel arbitration informed its adversary of the intention to seek arbitration "even if it has not yet filed a motion to stay the district court proceedings." Although buried in his brief, Mr. Lance contends Midland "did not even inform [him] that it was going to renew its motion to compel until after the motion for class certification was filed,"[97] which we will construe as arguing the third factor. We disagree with Mr. Lance. He could not have been surprised at Midland's renewed motion; our March 22, 2019 Order contemplated Midland renewing its efforts to compel arbitration and, to that end, amended our Scheduling Order to extend Phase I motions for summary judgment and class certification. From the beginning of this litigation, Midland stated an intent to compel arbitration. We cannot perceive how Mr. Lance believed Midland would abandon its effort after our March 22, 2019 Order. This factor weighs against waiver.

The fourth factor examines the extent of Midland's non-merits motion practice. Mr. Lance argues this factor is "not an absolute requirement" and our Court of Appeals has "found waiver even where no significant non-merits motion practice occurred."[98] Midland filed one motion for extension of time to move to compel and moved to seal certain portions of the Purchase Agreement attached to the renewed motion to compel. Mr. Lance argues this factor is neutral. Midland argues it did not engage in non-merits motion practice at all, significant or otherwise. We find this factor either neutral or weighing against waiver.

The fifth *Hoxworth* factor asks the extent a party "assent[s] to the court's pretrial orders." We do not find Midland's participation in the parties' Rule 26(f) report or telephonic attendance at our Rule 16 initial pretrial conference or any of its conduct to date demonstrates it "acted inconsistently with an intent to arbitrate."[99] Unlike the plaintiff in *Gray* belatedly seeking arbitration without indicating its intent to invoke the arbitration clause, Midland announced its

intent to compel arbitration from the time it filed its Answer. It again informed us and Mr. Lance of its intent to do so at our Rule 16 conference. This factor weighs against waiver.

The final factor focuses on the amount and scope of discovery to date. Mr. Lance argues the extent to which the parties engaged in discovery "fully supports, and defines the prejudicial nature of the current motion."[100] Mr. Lance contends "significant written discovery has been exchanged by both parties" and he has invested considerable time and money into the case to create prejudice. Midland contends it responded to discovery requests, but has not taken depositions. It appears from the attachments to Mr. Lance's motion for class certification and summary judgment, Midland responded to Requests for Admissions and Interrogatories. We do not perceive how the discovery already obtained, which should presumably be used in arbitration, creates prejudice to Mr. Lance. In *Gray Holdco*, the parties took discovery with regard to plaintiff's preliminary injunction, taking eight depositions, exchanging extensive written discovery responses including 200 separate interrogatories, requests for admission, document requests, and exchanged over 20,000 pages of documents and submitted to the district court 100 pages of proposed findings of fact and conclusions of law.[101] Considering the volume of discovery, the Court of Appeals found the factor neutral. The Court of Appeals noted when considering the sixth *Hoxworth* factor, the court looks at "the extend to which *both* parties have engaged in discovery."[102] Here, we can locate in the record only two written discovery requests and documents produced by Midland. We find this factor is either neutral or tending against waiver.

Considering the *Hoxworth* factors in the circumstances and context of this case, Midland did not waive the right to arbitration. Mr. Lance fails to demonstrate sufficient prejudice arising from the renewed motion to compel arbitration. The only possible prejudice is the work invested in Mr. Lance's motion for class certification; a motion he elected to file well before the filing

22

deadline and before Midland renewed its anticipated motion to compel arbitration plainly contemplated by our March 22, 2019 Order. Mr. Lance does not explain how the discovery supporting the merits of his claim, as referenced in his motion for summary judgment, is lost, without value, and will need to be duplicated in arbitration. Mindful of the directive we "will not infer lightly that a party has waived its right to arbitrate and will find that a party has waived the right 'only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery,'"[103] and finding no prejudice to Mr. Lance regarding a renewed motion to compel arbitration contemplated from the beginning of this case, Midland did not waive its right to arbitration.

## III. Conclusion

We grant Midland's renewed motion to compel individual arbitration and stay of the action pending arbitration in the accompanying order.

---

[1] Stipulation of Facts at ¶ 4 (ECF Doc. No. 13).

[2] Affidavit of Joline White at ¶ 6 (ECF Doc. No. 14-2).

[3] Affidavit of Joline White at ¶ 7 (ECF Doc. No. 14-2); Affidavit of Sean Mulcahy at ¶ 13 (ECF Doc. No. 14-3).

[4] ECF Doc. No. 14-2 at 7. We use the pagination assigned to the document by the CM/ECF docketing system.

[5] *Id.* (emphasis added).

[6] *Id.* (emphasis added).

[7] *Id.* (emphasis added).

[8] *Id.*

23

[9] *Id.*

[10] *Id.*

[11] ECF Doc. No. 31-3 at 2. The Court uses the pagination assigned to the document by the CM/ECF docketing system. Mr. Lance alleges Midland Funding is the parent of Midland Credit, both are debt collectors, and Midland Funding is vicariously liable for Midland Credit's collection letter. Complaint at ¶ 21 (ECF Doc. No. 1). We generally refer to Midland Funding and Midland Credit collectively as "Midland."

[12] ECF Doc. No. 31-3 at 2, Recitals ¶A.

[13] ECF Doc. No. 31-3 at Article I, § 1.1.

[14] *Id.*

[15] *Id.* at 6, Article II, § 2.1 (emphasis added).

[16] *Id.* at 10, Article IV, § 4.1(i).

[17] *Id.* at 43, § 42.

[18] Stipulation of Facts at ¶ 6 (ECF Doc. No. 13).

[19] Affidavit of Joline White at ¶ 10 (ECF Doc. No. 14-2); Affidavit of Sean Mulcahy at ¶¶ 3, 6 (ECF Doc. No. 14-3).

[20] Affidavit of Sean Mulcahy at ¶ 3 (ECF Doc. No. 14-3); Stipulation of Facts at ¶ 7 (ECF Doc. No. 13).

[21] ECF Doc. No. 14-3 at 7. The Court uses the pagination assigned to the document by the CM/ECF docketing system.

[22] Complaint at ¶¶ 7, 10 (ECF Doc. No. 1).

[23] 15 U.S.C. § 1692 *et seq.*

[24] ECF Doc. No. 14. Our January 23, 2019 Scheduling Order required all motions to compel arbitration to be filed by February 5, 2019. ECF Doc. No. 9 at ¶ 3. Midland moved, and we granted it, an extension of time to file its motion to compel arbitration to February 11, 2019. ECF Doc. No. 12.

[25] ECF Doc. No. 15.

[26] ECF Doc. No. 16.

24

[27] ECF Doc. No. 17.

[28] ECF Doc. No. 18.

[29] *Lance v. Midland Credit Mgmt.*, No. 18-4933, 2019 WL 1318542, at *8 (E.D. Pa. Mar. 22, 2019).

[30] *Id.*; ECF Doc. No. 20.

[31] ECF Doc. No. 20.

[32] ECF Doc. No. 25.

[33] ECF Doc. No. 29.

[34] ECF Doc. No. 30.

[35] ECF Doc. No. 31.

[36] ECF Doc. No. 32.

[37] ECF Doc. No. 32-3 at Appx. 12 - 31.

[38] *See* ECF Doc. No. 25-2. A portion of Midland's responses to Mr. Lance's First Set of Interrogatories are attached to Mr. Lance's motion for class certification.

[39] ECF Doc. No. 31.

[40] ECF Doc. No. 31-3 at Forward Flow Accounts Purchase Agreement, Article I, § 1.1.

[41] *Id.*, Article II, § 2.1 (emphasis added).

[42] *Id.* at 3, 5.

[43] 716 F.3d 764 (3d Cir. 2013).

[44] *Id.* at 776 (quoting *Somerset Consulting, LLC v. United Capital Lenders*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).

[45] *Id.* at 776 (quoting *Somerset Consulting*, 832 F. Supp. at 482).

[46] ECF Doc. No. 20.

[47] Fed.R.Civ.P. 56(a).

[48] *Guidotti*, 716 F.3d at 772 (quoting Fed.R.Civ.P. 56(c)(1)(A)).

[49] *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

[50] *ACE Am. Ins. Co. v. Guerriero*, 738 F.App'x 72, 77 (3d Cir. 2018) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 523 (3d Cir. 2009)).

[51] *Clymer v. Jetro Cash and Carry Enter.*, 334 F.Supp. 3d 683, 690 (E.D. Pa. 2018) (citing *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009); *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 264 (3d Cir. 2003)). Here, the Agreement between Mr. Lance and Synchrony Bank contains a choice of law provision applying Utah law "to the extent state law is relevant under the FAA." *See* ECF Doc. No. 14-2 at 7. Whether a valid agreement exists between the parties is a question of state contract law. *Scott v. Educ. Mgmt. Corp.*, 662 F. App'x 126, 130 (3d Cir. 2016) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 602 (3d Cir. 2002)). Here, Utah law would apply to determine whether a valid contract exists. Mr. Lance does not contest the existence of a valid contract; he argues Synchrony Bank did not sell its right to arbitration under the Credit Card Agreement to Midland. We need not determine whether a valid contract exists under Utah law.

[52] ECF Doc. No. 14-2 at 7 (emphasis added). There is no dispute the term "your account" means Mr. Lance's credit card account.

[53] *Id.* (emphasis added).

[54] ECF Doc. No. 31-3 at 6, Article II, §2.1.

[55] *Id.* at 2, Article I, § 1.1.

[56] No. 15-6119, 2017 WL 1807563 (D.N.J. May 5, 2017).

[57] *Lance,* 2019 WL 1318542 at *8.

[58] *Garcia*, 2017 WL 1807563 at *3.

[59] *Id.*

[60] ECF Doc. No. 35 at 2.

[61] Emphasis added.

[62] 9 U.S.C. § 3.

[63] ECF Doc. No. 14-2 at 7. The Court uses the pagination assigned to the document by the CM/ECF docketing system.

[64] ECF Doc. No. 14-2 at 7 (emphasis added). The Court uses the pagination assigned to the document by the CM/ECF docketing system.

[65] ECF Doc. No. 35 at 3 (emphasis in original).

[66] 271 F. Supp. 3d 738, 749 (M.D. Pa. 2017).

[67] *Id.* (quoting *Brown v. Sklar-Markind*, No. 14-266, 2014 WL 5803135, at * 12 (W.D. Pa. Nov. 7, 2014)).

[68] 870 F.3d 257 (3d Cir. 2017).

[69] *Id.* at 265.

[70] *Id.*

[71] *Id.*

[72] No. 314-115, 2015 WL 2220057 (S.D. Ga. May 11, 2015).

[73] *Id.* at *2.

[74] The court found Jefferson Capital established it owned plaintiff's credit card account as an assignee of the original creditor's agreement with plaintiff. *Id.* at *4-*5.

[75] *Id.* at *7 (footnote omitted) (emphasis in original).

[76] *Id.*

[77] *Id.* at *7, n.9, n.10.

[78] ECF Doc. No. 1 at ¶¶ 7-10.

[79] *See Brown v. Firstsource Advantage, LLC*, No. 17-5760, 2019 WL 568935,a t *5-*6 (E.D. Pa. Feb. 12, 2019) (distinguishing *Bazemore* and rejecting plaintiff's argument the court must find "express" or "clear and unmistakable intent" to arbitrate FDCPA claims in an agreement before compelling arbitration) (collecting cases compelling arbitration of FDCPA claims).

[80] ECF Doc. No. 14-2 at 7 (emphasis added).

[81] ECF Doc. No. 35 at 5.

[82] ECF Doc. No. 36 at 5-10.

[83] *Chong v. 7-Eleven, Inc.*, No. 18-1542, 2019 WL 1003135, at *8 (E.D.Pa. Feb. 28, 2019) (quoting *Paine Webber Inc. v. Faragalli*, 61 F.3d 1063, 1068–69 (3d Cir. 1995)).

[84] *Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191, 208–09 (3d Cir. 2010) (quoting *Hoxworth v. Blinder, Robinson & co., Inc.*, 980 F.3d 912, 926-27 (3d Cir. 1992)) ("*Hoxworth* factors").

[85] ECF Doc. No. 35 at 10. Mr. Lance argues all but the second *Hoxworth* factor.

[86] *Id.* at 7.

[87] ECF Doc. No. 35 at 10.

[88] ECF Doc. No. 36 at 5.

[89] No. 17-3118 at ECF Doc. No. 42.

[90] 654 F.3d 444, 456 (3d Cir. 2011). *Gray* is factually distinguishable. There, plaintiff demanded arbitration ten months after initially filing its complaint and after litigating an unsuccessful preliminary injunction proceeding. Our Court of Appeals, applying the *Hoxworth* factors, found four weighed in favor of finding plaintiff waived its right to arbitrate, one factor neutral, and one factor weighed in favor of finding plaintiff did not waive its right to arbitrate. *Id.* at 461. The court concluded plaintiff waived its right to arbitration.

[91] ECF Doc. No. 36 at 10 (emphasis in original).

[92] ECF Doc. No. 12.

[93] *Gray Holdco,* 654 F.3d at 451-52.

[94] *Id.* at 451 (citing *Nino*, 609 F.3d at 209).

[95] *Id.* at 452.

[96] ECF Doc. No. 9 at ¶ 4.

[97] ECF Doc. No. 35. Midland argues Mr. Lance did not address the third factor. ECF Doc. No. 36 at 9.

[98] *In re Pharmacy Benefit Managers Antitrust Litig.*, 700 F.3d 109, 119 (3d Cir. 2012) (citing *Gray Holdco*, 654 F.3d at 456).

[99] *Gray Holdco*, 654 F.3d at 460.

[100] ECF Doc. No. 35 at 8.

[101] *Gray Holdco*, 654 F.3d at 460-61.

[102] *Id.* at 461, n.14.

[103] *Id.* at 451 (quoting *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1069-69 (3d Cir. 1995).